UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

------------------------------------------------------
Timothy O'Meara,                                )
                                                )
Plaintiff,                                      )
                                                )
v.                                              )
                                                )
New Hampshire Supreme Court                     )
------------------------------------------------------

**MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF**

Petitioner Timothy O'Meara, Esq. submits this memorandum of law in support of his motion for injunctive relief. The petitioner is asking the Court to direct the New Hampshire Supreme Court to allow him to file a 134-page brief on his own behalf in a pending disciplinary action, to ensure that his Fourteenth Amendment due process rights will not be violated.

**Facts**

In May 2005, Anita Conant was rear-ended by a paving truck owned and operated by Lyons & Hohl Paving, Inc. in Pennsylvania, and suffered complete paralysis as a result of her injuries. She was 47 years old at the time. Ms. Conant and her husband James hired Attorney O'Meara to represent them in a personal injury action. They entered into a fee agreement under which O'Meara was entitled to 33.33% of any recovery obtained. Exh. A, ¶ 2.

O'Meara went to Pennsylvania a number of times, met with the Conants, interviewed witnesses, police and medical personnel, gathered evidence, and made a "day in the life" video to depict the scope of Anita Conant's injuries and their effect on her life and family. He filed suit against Lyons & Hohl in federal district court, and retained medical and financial experts. He

was able to force the analysis of the paving truck's "black box," which was instrumental in proving that the driver was going too fast and did not apply his brakes until after the impact. O'Meara purchased Ms. Conant's automobile from her insurance company, and had it shrink-wrapped and securely stored for future expert analysis. He argued with Lyons & Hohl's insurance company to get advances to cover certain medical expenses. The insurance company eventually made advances, but only after O'Meara convinced the defendants to concede liability in December 2005. O'Meara also negotiated with medical lien holders, and filed motions to compel discovery responses.[1]  Exh. A, ¶ 3.

On December 8, 2005 Attorney O'Meara wrote a "*Dumas*" letter to defense counsel, putting the defendant on notice that the Conants were prepared to proceed to trial if the defendant did not pay the entire amount of its coverage ($11,000,000.00), exposing the insurance company to potential additional liability under a claim for bad faith. Receiving no response, he wrote again on January 11, 2006 with the same purpose. James Conant was copied on both letters. Exh. A, ¶ 4.

While O'Meara did not have explicit authority from the Conants to make a *Dumas* demand, he believed he had implicit authority to do so under the fee agreement's provision authorizing him to "take all actions which are reasonable and necessary in this matter." O'Meara intended the letter solely to solicit an initial offer from the defense. He had no intent to waive the right to seek additional damages from Lyons & Hohl, to the extent that the company had available assets. He did not state in the letter that the Conants would dismiss their action or tender a release if the insurance company offered the policy limits. Exh. A, ¶ 5.

---

[1] There was an understood but rarely mentioned reality that delays in resolving the case increased the risk that Anita Conant would die before the case was resolved, in which case the likely recovery would be much less.

2

Nevertheless, on January 24, 2006 defense counsel called O'Meara to try to seal the deal. There is some dispute and confusion about whether he was communicating an *offer* from the insurance company at the policy limits, or purporting to *accept* the demand. In any event, O'Meara immediately informed defense counsel that settlement at the policy limits would not be acceptable. In correspondence that followed, defense counsel characterized the *Dumas* letter as an "offer" that O'Meara tried to withdraw after it had been accepted. O'Meara, on the other hand, stated that he had made a "demand" rather than an offer. Further, he made clear to defense counsel that any and all offers had to be in writing, and that he had withdrawn the demand during the telephone conversation. He firmly believed, and continues to believe, that there was never a meeting of the minds regarding settlement. However, defense counsel disagreed and filed a motion to enforce the purported "settlement." Exh. A, ¶ 6.

This turn of events displeased the Conants, who had begun to doubt that an $11 million resolution would be enough money to fund their "budget," which included not only anticipated costs for Anita Conant's care, but $8,140.00 per month for vacations, $4,175.00 per month for college expenses for their daughter, and $650,000.00 in home renovations. They not only contacted but made increasing use of another attorney to advise them how to break their fee agreement with O'Meara. In February 2006, when O'Meara met with his clients to prepare for a court-ordered mediation, they discussed reducing his fee from $3.66 million to $2 million. O'Meara believed they had reached an oral agreement to that effect. He later presented the Conants with a memorandum of understanding stating a fee of $2 million for any settlement up to $14.5 million (13.8%), which James Conant signed shortly before the mediation. Exh. A, ¶ 7.

During the mediation it became apparent from Lyons & Hohl's financial statements (reviewed by the federal magistrate acting as mediator) that the company could pay only

3

$500,000 without having to file for bankruptcy. The lawsuit was settled for $11.5 million. The Conants promptly began a fee dispute proceeding against O'Meara, which went to private arbitration. The arbitration panel awarded O'Meara $1,587,000 in total fees, representing 13.8% of $11.5 million. Exh. A, ¶ 8.

In February 2007 the Conants referred O'Meara to the New Hampshire Attorney Discipline Office. In 2009, Disciplinary Counsel alleged 17 violations of the New Hampshire Rules of Professional Conduct. Following four days of proceedings, the Hearings Committee issued a summary report finding unspecified violations of Rules 1.2(a) (scope of representation); 1.7(b) (conflict of interest); 8.4(c) (deceit); and 8.4(a) (general rule). In December 2009 the Hearings Committee conducted a non-evidentiary hearing on sanctions, then in February 2010 issued its full report. It found one violation of Rule 1.2(a) regarding settlement without client authority, an uncertain number of violations of Rule 1.7 regarding conflicts of interest, one violation of Rule 8.4(c) for testifying falsely before the fee dispute arbitration panel, and one violation of Rule 8.4(a) for violating the other rules. The Hearings Committee recommended disbarment. Exh. A, ¶ 9.

In May 2010 the Professional Conduct Committee ("PCC") heard oral argument on the recommendation. It generally accepted the Hearings Committee's findings of violations, but recommended a two-year suspension of O'Meara's license to practice law, plus an assessment of costs. Disciplinary Counsel sought reconsideration, asking the PCC to recommend disbarment and disgorgement of fees. The PCC denied the request for disgorgement of fees, but changed its recommendation from a two-year to a three-year suspension. In February 2011, the PCC petitioned the New Hampshire Supreme Court for a three-year suspension of O'Meara's license. Exh. A, ¶ 10.

On April 2, 2012 O'Meara filed a 134-page brief with the Supreme Court, together with a notification that he was filing a conditional brief beyond the standard page limits, or in the alternative a motion for extra pages or request for instructions from the Supreme Court. On April 6, 2012 the Supreme Court issued an order allowing him a 50-page brief, but otherwise denied his motion. The court subsequently denied his motion for reconsideration. Exh. A, ¶ 11.

## Argument

**I.  Due Process Requires the New Hampshire Supreme Court to Allow Petitioner to File a Brief of 134 Pages.**

The petitioner is faced with the potential deprivation of his ability to practice as a lawyer for the next three years. To present an adequate defense, he must have a sufficient opportunity to explain his actions to the Supreme Court, and to fully develop and communicate the complicated factual and legal issues involved. What he asks is a small and regrettable inconvenience to the Supreme Court, but a matter of grave importance to his professional future.

**A.  The Supreme Court Page Limit for Briefs Should Not Apply to the Disciplinary Proceeding.**

New Hampshire Supreme Court Rule 16(11) generally limits briefs to 35 pages. That Rule, however, appears to apply only to appellate briefs. Every mention of a brief in Rule 16(11) is in the context of an "appeal" or a "cross-appeal." Supreme Court Rule 3 defines an "appeal" as "[a]ppellate review of rulings adverse to a party, after a final decision on the merits in a trial court." A "decision on the merits" is an order issued "following a hearing on the merits or trial on the merits […]." *Id.*

The PCC cannot issue a final decision on the merits suspending an attorney for more than six months. That power lies solely with the Supreme Court. *See* Sup.Ct.R. 37(3)(c)(5); Sup.Ct.R. 37(16)(f); Sup.Ct.R. 37A (1)(c). Consequently, in the present matter the Supreme

5

Court is not acting in an appellate role. The page limit for appellate briefs should not apply, both as a procedural matter and because the Supreme Court is being called upon to do more than review the actions of a lower tribunal. It must exercise its exclusive jurisdiction to decide whether to suspend an attorney from the practice of law for more than six months. To fulfill that function, it must grant Attorney O'Meara an adequate opportunity to fully explain the circumstances and argue the law.

      **B.**      **If Applicable, the Page Limit for Briefs Must Be Waived to Satisfy Due Process Requirements.**

Even if the page limit is construed to apply in this type of case, in this instance the Supreme Court must waive it under Sup.Ct.R. 1 to satisfy due process guarantees. "When a State opts to act in a field where its action has significant discretionary elements, it must nevertheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *Bundy v. Wilson*, 815 F.2d 125 (1st Cir. 1987), quoting *Evitts v. Lucey*, 469 U.S. 387, 401 (1985). "A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment." *Schware v. Board of Bar Examiners of the State of New Mexico*, 353 U.S. 232, 239 (1957).

      **C.**      **The Elements of Due Process Weigh in Favor of the Petitioner.**

In analyzing what procedures are due in a particular case, courts consider the following factors:

1. the private interest that will be affected by the official action;

2. the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and

      3.      the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Matthews v. Eldridge*, 424 U.S. 319, 335 (1976); *Appeal of Plantier*, 126 N.H. 500, 507 (1985).

      1.      <u>The Petitioner Has a Significant Private Interest In the Exercise of His Profession.</u>

The right to engage in one's occupation is a privilege of fundamental significance. *Medina v. Rudman*, 545 F.2d 244, 250-51 (1st Cir. 1976). The proposed three-year suspension from the practice of law is a severe sanction. It would impose a heavy burden on the petitioner, not only depriving him of his employment, but impairing his ability to work at all. It is a deprivation that must not be entertained without a full understanding of all sides of the dispute that led to this juncture.

      2.      <u>The Procedures Offered by the Supreme Court Create a Risk of an Erroneous Deprivation of the Petitioner's Interest, Which Can Be Avoided by Allowing Him to State His Case in Full.</u>

In the context of criminal defense, the central due process question is whether appellants are provided "an adequate opportunity to present their claims fairly within the adversary system." *Ross v. Moffit*, 417 U.S. 600, 612 (1974). This is not a criminal matter, but it involves weighty stakes nevertheless, and there is no reason for the Court to apply a different standard here. It is impossible for Attorney O'Meara to present the events relevant to the allegations against him, explain the errors committed by the PCC, set forth the relevant law, and cogently present his argument in a 50-page brief. To attempt to do so, he would have to omit crucial information, exclude relevant law, or eliminate some arguments. That would deny the Supreme Court a complete picture, and pose a significant risk of erroneous deprivation of his professional

7

license. Attorney O'Meara is confident, however, that his 134-page brief allows him to fully present his defense. Exh. A, ¶ 12.

There are two separate records before the Supreme Court. The first is from the arbitration of the fee dispute between the Conants and Attorney O'Meara, heard over five days in 2006. The second is from the Hearings Committee proceeding, held over six days in 2009 and 2010. The records include numerous binders of documents.

There are three separate and discrete charges: settling the case without authority; conflicts of interest; and deceit. The alleged violations occurred at different times, in different contexts. The PCC cites as many as eight separate sets of facts giving rise to conflicts of interest. The surrounding circumstances of all eight must be fully described for the Supreme Court to understand O'Meara's argument that, from the entire course of conduct pertaining to each event, there were no conflicts. The deceit allegation detailed in the second set of transcripts stems from statements Attorney O'Meara made in the first set of transcripts. This makes both sets of transcripts relevant, and makes it necessary to compare one with the other as Attorney O'Meara attempts to prove a negative—that he did not commit deceit.

The PCC has urged the Supreme Court to take a narrow view of specific events divorced from the surrounding circumstances. It is a central theme of Attorney O'Meara's defense that a thorough exposition of his interactions with the Conants, defense counsel and others is necessary to demonstrate that his conduct was honest. It is only when the entire course of conduct is reviewed that one can understand the difficult choices Attorney O'Meara faced, how he resolved them, and the reasoned judgment he employed. Describing that entire course of conduct takes time and attention, and thus pages.

8

In addition, each allegation implicates a separate body of law regarding both culpability and appropriate sanctions. The Supreme Court's page limits, to the extent that they apply, are an artificial barrier to an already difficult task.

### 3. Allowing the Petitioner to File a Longer Brief Will Not Significantly Burden the Supreme Court or Interfere with Its Interests.

The petitioner seeks leave to file a brief of 134 pages instead of 50 pages. Reading a longer brief will be a somewhat greater burden on the Supreme Court. However, the magnitude of that increased burden is greatly outweighed by the potential harm of preventing the petitioner from fully defending himself. In fact, the additional pages may facilitate the Supreme Court's job by allowing the petitioner to clarify matters that would otherwise be muddled by excessive abbreviation. As the Supreme Court is the only body authorized to suspend an attorney's license for more than six months, this Court's ruling will have a very narrow application, and will not affect rights in the vast majority of Supreme Court cases, which involve appeals.

## II. Petitioner Is Entitled to Injunctive Relief.

The petitioner is likely to suffer irreparable harm if injunctive relief is denied. Once an attorney suspension or revocation order is issued, there is no appeal within the state court system. By the time an action in federal court to overturn the Supreme Court's ruling could be brought to a conclusion, the harm would already have been done. There would be no way to secure compensation for the loss of the petitioner's clients, reputation, and professional opportunities. Exh. A, ¶ 13. *See Vaqueria Tres Monjitas v. Irizarry*, 587 F.3d 464, 484-85 (1st Cir. 2009) (infringement of constitutional rights considered irreparable harm where potential loss is great enough to threaten the existence of the movant's business). Balancing the petitioner's interests

against those of the Supreme Court, it should be apparent that the equities and the public interest favor the allowance of full argument over compliance with a procedural rule.

## **Conclusion**

It was never Attorney O'Meara's wish to ask the federal courts to rule on a question of 84 pages of text. However, those 84 pages are no trivial matter. They may well mean the difference between being able to continue serving his clients and being excluded from his chosen profession for the next three years. From that perspective, his request is a modest one. Due process and fundamental fairness require the New Hampshire Supreme Court to allow him the space necessary to make his case, and to be fully heard in his own defense.

Respectfully submitted,

TIMOTHY O'MEARA

By his attorneys,

RANSMEIER & SPELLMAN
PROFESSIONAL CORPORATION

Date: May 14, 2012        By:  /s/ *Daniel J. Mullen*
                                Daniel J. Mullen (NHBA #1830)
                                One Capitol Street
                                P.O. Box 600
                                Concord, NH  03302-0600
                                (603) 410-6643

458353