UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

---------------------------------------------------------
Timothy O'Meara,                                )
                                                )
Plaintiff,                                      )
                                                )
v.                                              )
                                                )
New Hampshire Supreme Court                     )
---------------------------------------------------------

## AFFIDAVIT OF TIMOTHY O'MEARA, ESQ.

I, Timothy O'Meara, depose and state as follows:

1.      I was admitted to the New Hampshire bar in 1993, and am currently in a two-person personal injury law firm in Keene.

2.      In May 2005, Anita Conant was rear-ended by a paving truck owned and operated by Lyons & Hohl Paving, Inc. in Pennsylvania, and suffered complete paralysis as a result of her injuries. Ms. Conant and her husband James hired me to represent them in a personal injury action. We entered into a fee agreement under which I was entitled to 33.33% of any recovery obtained.

3.      I went to Pennsylvania a number of times, met with the Conants, interviewed witnesses, police and medical personnel, gathered evidence, and made a "day in the life" video to depict the scope of Anita Conant's injuries and their effect on her life and family. I filed suit against Lyons & Hohl in federal district court, and retained medical and financial experts. I was able to force the analysis of the paving truck's "black box," which was instrumental in proving that the driver was going too fast and did not apply his brakes until after the impact. I purchased Ms. Conant's automobile from her insurance company, and had it shrink-wrapped and securely

stored for future expert analysis.  I argued with Lyons & Hohl's insurance company to get advances to cover certain medical expenses.  The insurance company eventually made advances, but only after I convinced the defendants to concede liability in December 2005.  I also negotiated with medical lien holders, and filed motions to compel discovery responses.  There was an understood but rarely mentioned reality that delays in resolving the case increased the risk that Anita Conant would die before the case was resolved, in which case the likely recovery would be much less.

4. On December 8, 2005 I wrote a "*Dumas*" letter to defense counsel, putting the defendant on notice that the Conants were prepared to proceed to trial if the defendant did not pay the entire amount of its coverage ($11,000,000.00), exposing the insurance company to potential additional liability under a claim for bad faith.  Receiving no response, I wrote again on January 11, 2006 with the same purpose.  James Conant was copied on both letters.

5. While I did not have explicit authority from the Conants to make a *Dumas* demand, I believed I had implicit authority to do so under the fee agreement's provision authorizing me to "take all actions which are reasonable and necessary in this matter."  I intended the letter solely to solicit an initial offer from the defense.  I had no intent to waive the right to seek additional damages from Lyons & Hohl, to the extent that the company had available assets.  I did not state in the letter that the Conants would dismiss their action or tender a release if the insurance company offered the policy limits.

6. Nevertheless, on January 24, 2006 defense counsel called me to try to seal the deal.  I immediately informed defense counsel that settlement at the policy limits would not be acceptable.  In correspondence that followed, defense counsel characterized the *Dumas* letter as an "offer" that I tried to withdraw after it had been accepted.  I stated that I had made a

"demand" rather than an "offer." Further, I had made clear to defense counsel that any and all offers had to be in writing, and that I had withdrawn the demand during the telephone conversation. I firmly believed, and continue to believe, that there was never a meeting of the minds regarding settlement. However, defense counsel disagreed and filed a motion to enforce the purported "settlement."

7. This turn of events displeased the Conants, who had begun to doubt that an $11 million resolution would be enough money to fund their "budget," which included not only anticipated costs for Anita Conant's care, but $8,140 per month for vacations, $4,175 per month for college expenses for their daughter, and $650,000 in home renovations. They not only contacted but made increasing use of another attorney to advise them how to break their fee agreement with me. In February 2006, when I met with my clients to prepare for a court-ordered mediation, we discussed reducing my fee from $3.66 million to $2 million. I believed we had reached an oral agreement to that effect. I later presented the Conants with a memorandum of understanding stating a fee of $2 million for any settlement up to $14.5 million (13.8%), which James Conant signed shortly before the mediation.

8. During the mediation it became apparent from Lyons & Hohl's financial statements (reviewed by the federal magistrate acting as a mediator) that the company could pay only $500,000 without having to file for bankruptcy. The lawsuit was settled for $11.5 million. The Conants promptly began a fee dispute proceeding against me, which went to private arbitration. The arbitration panel awarded me $1,587,000 in total fees, representing 13.8% of $11.5 million.

9. In February 2007 the Conants referred me to the New Hampshire Attorney Discipline Office. In 2009, Disciplinary Counsel alleged 17 violations of the New Hampshire

3

Rules of Professional Conduct. Following four days of proceedings, the Hearings Committee issued a summary report finding unspecified violations of Rules 1.2(a) (scope of representation); 1.7(b) (conflict of interest); 8.4(c) (deceit); and 8.4(a) (general rule). In December 2009 the Hearings Committee conducted a non-evidentiary hearing on sanctions, then in February 2010 issued its full report. It found one violation of Rule 1.2(a) regarding settlement without client authority, an uncertain number of violations of Rule 1.7 regarding conflicts of interest, one violation of Rule 8.4(c) for testifying falsely before the fee dispute arbitration panel, and one violation of Rule 8.4(a) for violating the other rules. The Hearings Committee recommended disbarment.

10. In May 2010 the Professional Conduct Committee ("PCC") heard oral argument on the recommendation. It generally accepted the Hearings Committee's findings of violations, but recommended a two-year suspension of my license to practice law, plus an assessment of costs. Disciplinary Counsel sought reconsideration, asking the PCC to recommend disbarment and disgorgement of fees. The PCC denied the request for disgorgement of fees, but changed its recommendation from a two-year to a three-year suspension. In February 2011, the PCC petitioned the New Hampshire Supreme Court for a three-year suspension of my license.

11. On April 2, 2012 I filed a 134-page brief with the Supreme Court, together with a notification that I was filing a conditional brief beyond the standard page limits, or in the alternative a motion for extra pages or request for instructions from the Supreme Court. On April 6, 2012 the Supreme Court issued an order allowing me a 50-page brief, but otherwise denied my motion. The court subsequently denied my motion for reconsideration.

12. To present an adequate defense, I must have a sufficient opportunity to explain my actions to the Supreme Court, and to fully develop and communicate the complicated factual

4

and legal issues involved.  It is impossible to present the events relevant to the allegations against me, explain the errors committed by the PCC, set forth the relevant law, and cogently present my argument in a 50-page brief.  To attempt to do so, I would have to omit crucial information, exclude relevant law, or eliminate some arguments.  I am confident, however, that my 134-page brief allows me to fully present my defense.

   13. I will suffer irreparable harm if my license is erroneously suspended or revoked.  By the time an action in federal court to overturn the Supreme Court's ruling could be brought to a conclusion, the harm would have already been done.  There would be no way to secure compensation for the loss of my clients, reputation, and professional opportunities.

   The above statement is true to the best of my knowledge.

   Subscribed and sworn under the pains and penalties of perjury.

Date:  May 14, 2012      */s/ Timothy O'Meara*
              Timothy O'Meara

**STATE OF NEW HAMPSHIRE**
**COUNTY OF CHESHIRE**

   This instrument was acknowledged before me on this 14th day of May, 2012 by **Timothy O'Meara**, whose identity was determined by **(check box that applies and complete blank line, if any)**:

- ☐ My personal knowledge of the identity of said person **OR**
- ☐ The oath or affirmation of a credible witness, _____ (name of witness), the witness being personally known to me **OR**
- ☐ The following identification documents:
  - ☐ Driver's License
  - ☐ Passport
  - ☐ Other: _____

          */s/ Jacqueline Beck*
         Notary Public
         My Commission Expires:  02/22/2017

458560